**NATIONAL ASSOCIATION OF CASU- ALTY AND SURETY AGENTS, et al., Petitioners,**

**v.**

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent,**

**MNC Financial, Inc., Intervenor.**

**NATIONAL ASSOCIATION OF PROFESSIONAL INSURANCE AGENTS, et al., Petitioners,**

**v.**

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent,**

**Sovran Financial Corp., Intervenor.**

**Nos. 87–1354, 87–1355.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 15, 1988.

Decided Sept. 9, 1988.

Rehearing En Banc Denied Dec. 2, 1988.

---

**44.** *Gulf States Mfrs., Inc. v. NLRB,* 598 F.2d 896, 906 (5th Cir.1979) (concurring and dissenting opinion).

Jonathan B. Sallet, with whom Jamie S. Gorelick was on the brief, for petitioners. David G. Webbert, Washington, D.C., also entered an appearance, for petitioners.

Richard M. Ashton, Board of Governors of the Federal Reserve System, with whom John R. Bolton, Asst. Atty. Gen., Richard K. Willard, Asst. Atty. Gen.,* J. Virgil Mattingly, Jr., and James A. Michaels, Board of Governors of the Federal Reserve System, Washington, D.C., were on the brief, for respondents.

John D. Hawke, Jr., Kenneth A. Letzler and Leigh McGuigan, Washington, D.C., were on the brief, for intervenor Sovran Financial Corp.

Kenneth C. Bass, III, Washington, D.C., was on the brief for intervenor MNC Financial, Inc.

Ernest Gellhorn and Robert C. Jones, Washington, D.C., for Conference of State Bank Supervisors, John J. Gill and Michael F. Crotty, Washington, D.C., for American Bankers Ass'n, and Richard Whiting, Washington, D.C., for Ass'n of Bank Holding Companies, were on the joint brief for amici curiae, Conference of State Bank Supervisors, et al., urging affirmance. James F. Bell, Washington, D.C., also entered an appearance for amicus curiae, Conference of State Bank Supervisors.

Before RUTH BADER GINSBURG, SILBERMAN and BUCKLEY, Circuit Judges.

* At the time the initial brief was filed.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Dissenting opinion filed by Circuit Judge BUCKLEY.

SILBERMAN, Circuit Judge:

In June and July of 1987, the Board of Governors of the Federal Reserve System, which regulates bank holding companies, approved the applications of two bank holding companies, Sovran Financial Corporation ("Sovran") and Maryland National Corporation ("MNC"), to retain insurance agency operations of recently acquired bank holding companies. Each of the two acquired bank holding companies sold insurance pursuant to a grandfather clause in the Garn–St Germain Act of 1982. Petitioners, various insurance agency trade groups, object to the Board's actions, which allow Sovran and MNC to compete with their members for insurance business. Petitioners contend, in particular, that under the Bank Holding Company Act ("the Act") (as amended by the Garn–St Germain Act), grandfather rights to sell insurance expire when a grandfathered corporation is purchased by another bank holding company not itself eligible to engage in that business. Alternatively, petitioners claim that the bank holding company acquired by Sovran never legitimately acquired grandfather rights in the first place. We uphold the Board's interpretation of the Bank Holding Company Act, and we decide that the Board was justified in determining that the bank holding company acquired by Sovran possessed grandfather rights. The petitions for review are therefore denied.

I.

In 1985, Sovran Financial Corporation, a bank holding company, applied to the Board for permission to acquire Suburban Bancorp, also a bank holding company, and its subsidiary bank, Suburban Bank. Suburban, a state-chartered bank located in Maryland, in turn controlled a subsidiary corporation, Suburban Insurance, which operated as an insurance agency. Sovran's application to the Board for approval of

this acquisition was opposed by various insurance industry trade groups, which argued that the acquisition of an insurance agency by a bank holding company was prohibited by section 4(c)(8) of the Bank Holding Company Act. *See* 12 U.S.C. § 1843(c)(8). In order to avoid delay in its acquisition of Suburban Bancorp, Sovran agreed that Suburban Insurance would temporarily cease writing new policies, leaving to a later date resolution of the issue raised by the protestants. The acquisition was in that form approved by the Board. In November 1986 Sovran applied to the Board again, this time seeking leave to retain indirect control over Suburban Insurance (which would then resume selling insurance). Sovran claimed that the insurance activities of the subsidiary qualified for Exemption D grandfather rights and that its acquisition of Suburban Bancorp did not extinguish the exemption.[1] This application was again opposed by insurance industry trade groups, but was nevertheless ultimately approved by the Board. *Sovran Financial Corp.*, 73 Fed. Res.Bull. 672 (1987).

The circumstances of Maryland National Corporation's application are similar. MNC, a bank holding company, acquired American Security Corporation, also a bank holding company. American Security Corporation engages in general insurance agency activities through both an unincorporated division and, in Maryland, through a separate subsidiary corporation. The Board approved MNC's acquisition on the condition that MNC either divest itself of American Security's insurance business or secure approval under section 4(c)(8). *Maryland National Corp.*, 73 Fed.Res.Bull. 310, 314 (1987) (*"MNC I"*). The Board denied MNC permission to sell insurance

pursuant to the separate grandfather privileges of section 4(a)(2) of the Act; determining that a bank holding company was not entitled to section 4(a)(2) grandfather privileges when it purchased a company that had itself previously qualified for these rights. *Id.* at 312. After the acquisition had been effected, MNC applied for Board approval to sell insurance under Exemption D, and the Board granted this request, again over the opposition of insurance agency trade groups. *Maryland Financial, Inc.*, 73 Fed.Res.Bull. 740 (1987) (*"MNC II"*).

The Bank Holding Company Act prohibits a bank holding company from acquiring and retaining shares of any company that is not a bank or a bank holding company and from engaging in nonbanking activities unless the Board determines that such activities are "so closely related to banking ... as to be a proper incident thereto." 12 U.S.C. § 1843(c)(8). *See generally Independent Ins. Agents v. Board of Governors*, 835 F.2d 1452 (D.C.Cir.1987). Section 4(a)(2) (as amended in 1970) contains a grandfather clause that exempts nonbank activities of any kind (including insurance agency activity) in which a bank holding company, directly or through a subsidiary, engaged on June 30, 1968. The Garn–St Germain Act, passed in 1982, declares that insurance activity is not closely related to banking, and thus effectively prohibits bank holding companies or their subsidiaries from engaging in that business. That act contains seven exemptions to its general prohibition, including two additional grandfather clauses, Exemption D and Exemption G.

Exemption D excludes "insurance agency activity which was engaged in by the bank

**1.** Sovran argued, in the alternative, that the Board did not have jurisdiction under the Bank Holding Company Act over the activities of a state-chartered bank owned by a holding company. The Board, however, declined to address this issue, and instead approved Sovran's application for grandfather rights under Exemption D. *Sovran Financial Corp.*, 73 Fed.Res.Bull. 672, 673 (1987). Sovran has intervened in this petition in support of the Board's order, and renews its jurisdictional argument before this court. But, only a "party aggrieved by an order

of the Board" may obtain review of the order. 12 U.S.C. § 1848 (1982). As Sovran received what it requested—approval of its application—it is not a party aggrieved. *See Water Transp. Ass'n v. ICC,* 819 F.2d 1189, 1193 (D.C.Cir.1987). That Sovran might have preferred the Board to have approved the order under a different legal theory, perhaps, for example, to facilitate future acquisitions of state-chartered banks, does not suffice to make it a "party aggrieved." *Transwestern Pipeline Co. v. FERC,* 747 F.2d 781, 785 & n. 5 (D.C.Cir.1984).

holding company or any of its subsidiaries on May 1, 1982." 12 U.S.C. § 1843(c)(8)(D).[2] Exemption D contains certain limitations on growth that play an important part in the Board's decisions under review here. A bank holding company that sells insurance under Exemption D may not expand its sales activity into states in which it had not sold insurance prior to 1982 (unless the state is adjacent to one in which it did sell insurance), and it may not expand its insurance business to cover types of risks different from those it covered in May 1982. *Id.* Exemption G excludes bank holding companies involved "directly or indirectly, in insurance agency activities as a consequence of approval by the Board prior to January 1, 1971." 12 U.S.C. § 1843(c)(8)(G). Unlike Exemption D, neither Exemption G nor section 4(a)(2) contain any limitations on expansion into new geographical markets or into different lines of insurance and, based on this distinction, the Board has interpreted the Act to allow only Exemption D rights to survive acquisition.

A single bank holding company, for example, one that had been selling insurance prior to 1968, might conceivably qualify to engage in insurance agency activities under all three of these grandfather clauses. Yet if that company were acquired by another bank holding company, the Board would allow the acquiring company to continue selling insurance only pursuant to Exemption D, and any rights that flowed

solely from section 4(a)(2) or Exemption G would expire upon the acquisition. Indeed, MNC, whose application is being challenged here, originally applied to the Board for authority to have American Security Corporation, the company it was purchasing, continue selling insurance under section 4(a)(2) and was denied. *MNC I*, 73 Fed.Res.Bull. 310. And, in an order subsequent to those under consideration here, the Board decided that Exemption G grandfather rights would also expire upon acquisition by a non-qualifying company. *Trustcorp, Inc.*, 73 Fed.Res.Bull. 827 (1987) (*"Trustcorp I"*). But in a later decision, the Board allowed that same applicant to continue to engage in insurance activity pursuant to Exemption D. *Trustcorp, Inc.*, 73 Fed.Res.Bull. 934 (1987) (*"Trustcorp II"*).

In its *Sovran* decision, the Board explained that the actual language of the statute does not specifically address the issue under consideration here—whether a bank holding company that qualifies for Exemption D rights may be acquired by another bank holding company without losing those rights. *Sovran Financial Corp.*, 73 Fed.Res.Bull. at 676. The Board thought that both the legislative history and the terms of the statute itself suggested a congressional intent that Exemption D privileges be identified with the precise entity that originally qualified for them. The Board quoted the Senate Committee Report which states that "[t]he authority to en-

---

**2.** The full text of Exemption D is as follows: (D) any insurance agency activity which was engaged in by the bank holding company or any of its subsidiaries on May 1, 1982, or which the Board approved for such company or any of its subsidiaries on or before May 1, 1982, including (i) sales of insurance at new locations of the same bank holding company or the same subsidiary or subsidiaries with respect to which insurance was sold on May 1, 1982, or approved to be sold on or before May 1, 1982, if such new locations are confined to the State in which the principal place of business of the bank holding company is located, any State or States immediately adjacent to such State, and any State or States in which insurance activities were conducted by the bank holding company or any of its subsidiaries on May 1, 1982, or were approved to be conducted by the bank holding company

or any of its subsidiaries on or before May 1, 1982, and (ii) sales of insurance coverages which may become available after May 1, 1982, so long as those coverages insure against the same types of risks as, or are otherwise functionally equivalent to, coverages sold on May 1, 1982, or approved to be sold on or before May 1, 1982 (for purposes of this subparagraph, activities engaged in or approved by the Board on May 1, 1982, shall include activities carried on subsequent to that date as the result of an application to engage in such activities pending on May 1, 1982, and approved subsequent to that date or of the acquisition by such company pursuant to a binding written contract entered into on or before May 1, 1982, of another company engaged in such activities at the time of the acquisition) [.]
12 U.S.C. § 1843(c)(8)(D).

gage in activities under [Exemption D] only extends to the entity, be that the holding company itself or a subsidiary or subsidiaries thereof, which qualifies for the grandfathered activities status." *Id.* (quoting S.REP. No. 536, 97th Cong., 2d Sess. 40 (1982) U.S.Code Cong. & Admin.News pp. 3054, 3094). Thus, if a bank holding company owned three banks, only one of which qualified under Exemption D to sell insurance, the other two banks, or any other subsidiaries or affiliates of the bank holding company, could not sell insurance, because "exemption D rights attach [only] to the entity actually conducting the activity on the grandfather date." *Id.* The Board concluded from the circumscribed nature of Exemption D rights that "the intent of the statute is that the grandfathered subsidiary continues to be able to engage in the activity, even if acquired by another bank holding company so long as the subsidiary complies with the geographic and functional limitations proscribed [sic] in exemption D." *Id.*

This outcome, according to the Board, is consistent with the basic purpose of the grandfather clause, which is to provide stability to established business relationships. The geographical and product line limitations on expansion contained in Exemption D continue in effect after acquisition. Therefore, in the Board's words, "the acquisition does not disturb the status quo insofar as the insurance activities of Suburban Insurance are concerned." *Id.* A contrary decision would require the disruption of ongoing commercial relationships whenever a grandfathered bank holding company is acquired by a non-qualifying company.

## II.

Petitioners argue that the Board's approval of Sovran's application is arbitrary and capricious because the Board did not adequately explain its disparate treatment of Exemption D grandfathered rights as compared with Exemption G and section

4(a)(2) rights.[3] The Board, according to petitioners, correctly applied three legal principles in its Exemption G and 4(a)(2) orders, but inexplicably ignored these same principles in its *Sovran* and *MNC II* orders. In the Exemption G and 4(a)(2) orders, *MNC I* and *Trustcorp I*, the Board required that the acquiring company independently qualify for grandfather rights. A bank holding company could not, therefore, sell insurance merely because a company it purchased had Exemption G or 4(a)(2) rights. And in *MNC I* the Board reasoned that the absence of any provision in the Bank Holding Company Act, as amended, permitting the transfer of grandfather rights from one bank holding company to another meant that no transfer could be allowed. *MNC I*, 73 Fed.Res.Bull. at 312–13. Finally, in both *MNC I* and *Trustcorp I*, the Board recognized that grandfather clauses are to be construed narrowly, as exceptions to general rules. *Id.* at 313–14; *Trustcorp I*, 73 Fed.Res.Bull. at 829. The Board concluded, therefore, that Exemption G and 4(a)(2) grandfather rights expire when a company with these rights is acquired by a non-qualifying bank holding company.

The Board distinguishes its interpretation of the other two clauses because Exemption D grandfather rights—unlike Exemption G and 4(a)(2) rights—are quite narrow. In particular, as we have noted, Exemption D rights may not be transferred within a bank holding company, and expansion is limited both in terms of geography and product lines. In *Trustcorp I*, the Board explained that the insurance agency sought to be retained there could have, pursuant to Exemption G, "operate[d] in every office of Applicant and could solicit every customer of Applicant for any type of insurance." *Trustcorp I*, 73 Fed.Res. Bull. at 829. And as the Board concluded in *MNC I*, to permit section 4(a)(2) grandfather rights to survive an acquisition "would open a substantial loophole in the Act by allowing a nongrandfathered holding company to engage in a wide variety of non-

---

**3.** Intervenor MNC argues that petitioners do not have standing. For the reasons given in *Investment Company Institute v. Board of Governors,* 606 F.2d 1004, 1010–11 (D.C.Cir.1979), *rev'd on other grounds,* 450 U.S. 46, 101 S.Ct. 973, 67 L.Ed.2d 36 (1981), we disagree.

banking activities by acquiring one or more of the numerous bank holding companies with existing grandfather rights." 73 Fed. Res.Bull. at 313. On the other hand, the Board reasons that when grandfather rights are themselves limited and cannot expand upon acquisition—as is true of Exemption D rights—the restrictive policy, to which the grandfather rights are an exception, is not so strongly threatened by a change in ownership of the grandfathered entity. Hence, it concludes that Suburban Bancorp is not required to cease its insurance activities upon its acquisition by Sovran Financial, since those activities are not subject to expansion due to the acquisition.

■ It is, of course, a fundamental precept of administrative law that "[a]gencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departure." *National Conservative Political Action Comm. v. FEC*, 626 F.2d 953, 959 (D.C.Cir.1980). In this case, the Board has rather easily met that test by relying—for its differing treatment of the three grandfather clauses—on their different economic impact. The Board's interpretation of Exemption D cannot be successfully attacked as a matter of administrative law merely because the Board has otherwise construed the two companion grandfather clauses. *See Common Cause v. FEC*, 842 F.2d 436, 441–42 (D.C.Cir.1988) (where agency provides a reasonable explanation for interpreting the word "name" differently in separate sections of same statute, its construction is upheld). The real question here, to which we now turn, is whether Exemption D will bear the interpretation the Board places upon it.

### III.

■ Petitioners maintain that the Board's interpretation of Exemption D is contrary to congressional purpose, and so must be rejected. As is now well settled, our role in reviewing an agency's interpretation of a statute it administers is strictly confined. We examine the language of the statute and, if necessary, the legislative history to determine whether Congress had a specific intent. If the agency's interpretation is inconsistent with Congress's clear intent, that interpretation is invalid. Otherwise, we owe considerable deference to the agency, and we must uphold the agency's interpretation if reasonable. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *Securities Indus. Ass'n v. Board of Governors*, (D.C.Cir.1988).

Under Exemption D, "insurance agency activity which was engaged in by the bank holding company or any of its subsidiaries on May 1, 1982" is excluded from the general prohibitions contained in sections 4(a)(1) and 4(a)(2) of the Act. *See* 12 U.S.C. § 1843(c)(8)(D). Petitioners assert that the only bank holding companies that may sell insurance, directly or indirectly, under this provision are those actually described in Exemption D, and, insofar as neither Sovran nor MNC was itself "engaged in" selling insurance prior to May 1, 1982, the statute prohibits the two companies from doing so now. That the Board explicitly conditioned its approval of Sovran's application to retain Suburban Insurance upon Suburban remaining an "independent and separate subsidiary of Sovran," *Sovran Financial Corp.*, 73 Fed.Res.Bull. at 677, is irrelevant according to petitioner because Sovran, not Suburban, must meet the grandfather criteria. Petitioners emphasize that Exemption D refers to activity "engaged in by *the* bank holding company" and argue that this reference means that for any bank holding company successfully to assert Exemption D rights, it has to be *the* bank holding company that was engaged in the activities in 1982. The statute, according to petitioners, allows a bank holding company to sell insurance only if that *same* bank holding company was selling insurance prior to May 1, 1982, which is another way of saying grandfather rights may not be transferred with corporate ownership.[4] That argument suggests that

---

4. If Suburban's stock were sold to an individual, however, presumably under petitioners' view, no problem would arise.

Congress meant to resolve the important question whether Exemption D grandfather rights would survive a corporate acquisition by a bank holding company by using the word "the" rather than "a" as the modifier of bank holding company in the first line of Exemption D. This seems to us to be an unlikely way for Congress to signal its intent on such a major issue. We think that "the" as used in this context is a good deal less revealing than petitioners assert, and we do not believe we can reject the Board's construction based on what might be thought to be a fortuitous choice of an article. *Cf. Young v. Community Nutrition Inst.*, 476 U.S. 974, 980–81, 106 S.Ct. 2360, 2364–65, 90 L.Ed.2d 959 (1986).

Petitioners claim that other language in Exemption D, by implication, supports their suggested interpretation. The exemption specifically allows a bank holding company that was not selling insurance on May 1, 1982 to exercise grandfather rights if it had contracted by that date to purchase a company that was itself selling insurance. This provision, it is argued, demonstrates that Congress explicitly considered the problem of transfers of ownership of grandfathered businesses and determined that this particular instance was the only one where an acquiring bank holding company could continue to engage in grandfathered activity. In Latin: *Expressio unius est exclusio alterius.* The Board thinks, however, that Exemption D by itself neither prohibits nor allows any particular activity. It serves instead only to describe whether and when grandfather rights come into existence. The clause regarding a contract to purchase merely sets out one circumstance, according to the Board, in which a corporation will be deemed to be engaged in the sale of insurance on the relevant date and therefore will be entitled to grandfather rights. In the Board's view, Exemption D does not really even

address the question of whether, once those rights arise, a bank holding company with grandfather rights may be acquired without losing those rights.

We think both interpretations of the language of Exemption D are plausible; neither in our view flows ineluctably from the statute itself. Nor does the legislative history of Exemption D provide a definite answer to this question. The Senate Committee Report simply explains that:

> The authority to engage in activities under the grandfather amendment only extends to the entity, be that the holding company itself or a subsidiary or subsidiaries thereof, which qualifies for the grand fathered [sic] activities status. *This limitation is intended to prevent a bank holding company from transferring any grandfather authority among the companies within the holding company system.* Thus, for instance, if the grandfathered insurance activity is the sale of property and casualty insurance in connection with loans made by a mortgage banking subsidiary of a bank holding company, that activity cannot be transferred to any other nonbank subsidiary of the same holding company or to any loans made by any other subsidiary.

S. Rep. No. 536, 97th Cong., 2d Sess. 40 (1982) U.S.Code Cong. & Admin.News p. 3094 (emphasis added).[5] The Board's counsel argues that the very restriction on transfers of grandfather rights within the bank holding company organization that originally qualified for such rights suggests that if the ownership of the bank holding company itself changes hands, and the transfer is thus between independent bank holding companies, the grandfathered entity may continue to exercise its Exemption D rights. To be sure, such a limitation may, as we have indicated, justify permitting grandfathered activities to continue

---

**5.** As petitioners point out in their brief, this statement was subsequently modified by the Conference Report, which would allow grandfather rights to be transferred within the holding company "if the transferral is brought about for management or efficiency purposes." H.R. Conf. Rep. No. 899, 97th Cong., 2d Sess. 91 (1982). This modification only affects the de-

gree of limitations on intrabank holding company transfers however, and does not bring into doubt that Congress intended there to be some significant restrictions. Furthermore, the modification is not important for purposes of this opinion, for we do not accept the Board's view of the Senate Report in any event.

following an acquisition *as a matter of Board policy* (since expansion of those activities would be restricted), but this legislative history does not really bear on the separate question, *whether Congress intended* that grandfather rights should survive an acquisition. We agree with petitioners that an express restriction on the transfer of rights *within* a bank holding organization surely does not indicate that Congress intended such rights to be transferable, through purchase or sale, *among* bank holding companies. If anything, it more nearly suggests the contrary. On the other hand, neither does this excerpt from the committee report demonstrate that Congress had any specific intent that intercorporate transfers not be permitted.

Other legislative history, however, does provide support for an interpretation that would—as does the Board's—allow for measured growth of the grandfathered business.

> The purpose of [Exemption D] is to permit bank holding companies which have been engaged or have received approval to engage in the insurance business *to expand such business, within reasonable limits.* The amendment provides bank holding companies with enough latitude to grow and compete successfully without permitting unbridled expansion of grandfathered activities. Without providing such companies with a broadened ability to expand and grow, they would not survive long in a competitive environment.
>
> . . . .
>
> While the amendment does restrict the locations and scope of grandfathered insurance activities, there is no limitation placed on increases in the volume of such insurance business which may be achieved by a holding company or nonbank subsidary [sic].

S. REP. No. 536, 97th Cong., 2d Sess. 39 (1982) U.S.Code Cong. & Admin.News p. 3093 (emphasis added).

We are left, then, with competing acceptable interpretations of the words of the statute. While we concede that, were we confronted with this question in the first instance, we would prefer petitioners' construction of the statute over the Board's, it seems to us nevertheless untenable to conclude that "Congress has ... directly addressed the precise question at issue." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782; *see K Mart Corp. v. Cartier, Inc.,* —— U.S. ——, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988); *Young v. Community Nutrition Inst.,* 476 U.S. 974, 980–81, 106 S.Ct. 2360, 2364–65, 90 L.Ed.2d 959 (1986) (finding ambiguity even where one reading of the statute was probably "the more natural interpretation"); *National Coalition Against the Misuse of Pesticides v. Thomas,* 809 F.2d 875, 881–82 (D.C.Cir.1987). The statute does not explicitly deal with what happens to grandfather rights once the ownership of the entity holding the rights changes. This issue, which obviously holds important consequences for the future relationship between bank holding companies and insurance agency activities, could easily have been addressed in a straightforward fashion by Congress. But nothing in either the language or structure of the statute, or in the legislative history, conclusively resolves this dispute. *See FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 102 S.Ct. 38, 70 L.Ed. 2d 23 (1981) (where statute did not explicitly either prohibit or allow for certain agency agreements, administrative determination allowing such agreements is upheld).

We cannot say, moreover—moving to the second step of the *Chevron* inquiry—that the Board's interpretation of Exemption D is unreasonable. Grandfather rights are always in tension with the legislative rule to which they are an exception. Petitioners' suggested interpretation would ameliorate that tension by providing for the inevitable shrinking of grandfather rights under Exemption D. In an era of dynamic mergers and acquisitions in the banking business (of which Congress was well aware, S. REP. No. 536, 97th Cong., 2d Sess. 3–4 (1982)), these grandfather rights, if they could not survive acquisitions would (like Marx's State) wither away. The Board, by permitting Exemption D rights to survive an acquisition by a bank holding company (and prohibiting the same treat-

ment of Exemption G or 4(a)(2) rights), has taken a middle ground. It has sought, as closely as it could, to maintain the relative status quo in economic or competitive terms. We think that is a permissible reconciliation of the inherent tension of the statute; it ensures that grandfathered insurance activities will expand—"within reasonable limits." Even if we were inclined to strike the balance differently, we would be obliged to defer to the Board since its approach is a "reasonable accommodation of the conflicting policies." *Baltimore Gas and Elec. Co. v. United States,* 817 F.2d 108, 115 (D.C.Cir.1987).

## IV.

■ Petitioners also argue, independently of their challenge to the Board's decision to allow grandfather rights to survive acquisition, that Suburban Bancorp never legally qualified for grandfather rights under Exemption D. If petitioners are correct, then, of course, Sovran did not acquire any grandfather rights when it purchased Suburban. Section 225.22(d) of the Board's Regulation Y allows a state bank to "[a]cquire or retain all ... of the securities of a company that engages solely in activities in which the parent bank may engage." 12 C.F.R. § 225.22(d)(2)(ii) (1988). In 1972, when Suburban Bancorp applied to the Board to become a bank holding company, Suburban Bank relied on this exception to the Bank Holding Company Act's nonbanking prohibitions to permit it to retain indirect control of Suburban Insurance, which was, as we have said, its subsidiary. At that time, Suburban Bancorp notified the Board that Suburban Bank had a subsidiary that was a general insurance agency. And in 1972, the Maryland Deputy Bank Commissioner, in response to a Board inquiry concerning Suburban Insurance, stated that the Maryland Bank Commission was aware of Suburban's insurance activities and "took no exception."[6] Again in 1986, the Maryland Bank Commissioner told the Board that

"Suburban's insurance activities are and have been lawful activities for a state-chartered bank in Maryland." The next year, 1987, however, with the acquisition pending, the Maryland Insurance Commissioner informed the Board that, under the Maryland Insurance Code, a state chartered bank could not secure a Certificate of Qualification *directly* to engage in insurance activities if the bank was primarily involved in banking rather than insurance. A bank could, nevertheless, own an insurance agency or have employees who were licensed insurance agents, all without violating the Insurance Code.

Petitioners fasten upon the 1987 statement by the Insurance Commissioner that a Maryland bank may not directly sell insurance (although it may do so through a subsidiary) and assert that Suburban Bancorp's acquisition and retention of Suburban Insurance in 1972 violated section 225.22(d) of Regulation Y. It is argued that since Regulation Y allows a bank to own only a company that engages in activities "in which the parent bank may engage," and since the Insurance Commissioner has stated that a bank may not *directly* sell insurance, Suburban Bancorp could not have acquired and retained an insurance agency without violating Regulation Y. Therefore, the argument is that Suburban Bancorp acquired no Exemption D grandfather rights in 1982, because its retention of Suburban Insurance turned out in hindsight to be contrary to Regulation Y. We note that no allegations are made that Suburban Bancorp violated Maryland state law. The contention is rather that the Board was operating under a misconception in assuming, in 1972, that Regulation Y was satisfied, because the Board did not realize—through no fault of Suburban— that a Maryland bank could not directly sell insurance.

The Board rejected petitioners' argument. It stated that

the overriding factor in this case is that the activities were being conducted on

---

**6.** The Board's inquiry was itself motivated by an inquiry from a law firm representing certain insurance agency trade groups to the Federal Reserve Bank of Richmond concerning Suburban's insurance activities.

[May 1, 1982] and for many years prior thereto with the knowledge of the Board and state regulatory agencies and *without* a *determination* by these agencies that the activities were not in accordance with applicable statutes and regulations. 73 Fed.Res.Bull. at 674–75 (emphasis added). We think the Board acted within its legitimate discretion to interpret both the statutes and its own regulations in that fashion. *See Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965). To be sure, legislative history indicates that Congress thought a company "engaged" in the grandfathered activity on May 1, 1982 only if it acted "in accordance with the applicable statutory and regulatory standards as of the grandfather date." S. REP. No. 536, 97th Cong., 2d Sess. 39 (1982). Still, as the Board notes, the same Senate Report refers to "authorized" insurance activity and the Board, it seems to us, reasonably concluded that it had authorized Suburban's activities even if it did so, as it happened, mistakenly. To deny Suburban's grandfather rights after the bank had operated openly as it did with the full knowledge and tacit or explicit approval of all state and federal regulatory bodies (and without objection from insurance company competitors) for fifteen years would seem inequitable. A contrary ruling, moreover, would subject grandfather rights to subsequent evolving or clarifying interpretations of often complex state laws. In the absence of any indication of bad faith on the part of Suburban, the Board is entitled to do as it did here—recognize those rights as they appeared on the grandfather date. Accordingly, the petitions for review are DENIED.

BUCKLEY, Circuit Judge, dissenting:

This case hangs on the meaning of a single word as used in one clause of a complex statute. If, in context, its meaning is ambiguous and the construction placed on it by the Federal Reserve Board reasonable, the majority properly deferred to the agency's interpretation and reached an appropriate disposition of this case. As I find the statutory language devoid of ambiguity and its clear meaning incompati-

ble with the interpretation placed upon it by the Board, I respectfully dissent.

The word in question is the article "the." It appears in the following context in Exemption D of section 4(c)(8) of the Bank Holding Company Act, 12 U.S.C. § 1843(c)(8)(D): "insurance agency activity ... engaged in by *the* bank holding company or any of its subsidiaries on May 1, 1982" (emphasis added). To place this language in its statutory context, I quote the relevant portions of section 4:

(a) ... [N]o bank holding company shall—

(1) acquire direct or indirect ownership or control of any voting shares of any company which is not a bank, or

(2) ... retain direct or indirect ownership or control of any [such] voting shares ... or engage in any activities other than ... those ... authorized under this chapter ... and ... those permitted under paragraph (8) of subsection (c) of this section....

(c) The prohibitions in this section shall not apply to ... (8) shares of any company the activities of which ... [are] closely related to banking ..., but for purposes of this subsection it is not closely related to banking ... to provide insurance as a principal, agent, or broker except ... (D) any insurance agency activity which was engaged in by the bank holding company or any of its subsidiaries on May 1, 1982, or which the Board approved for such company or any of its subsidiaries on or before May 1, 1982, including (i) sales of insurance at new locations of the same bank holding company or the same subsidiary or subsidiaries with respect to which insurance was sold on May 1, 1982, ... and (ii) sales of insurance coverages which may become available after May 1, 1982, so long as those coverages insure against the same types of risks as, or are otherwise functionally equivalent to, coverages sold on May 1, 1982....

12 U.S.C. § 1843(a) & (c) (1982).

This language could hardly be more precise. Section 4(a) provides that no bank

holding company shall acquire control over any company that is not a bank, nor shall it retain such shares or continue to engage in activities not authorized by the Act, unless *it* qualifies for one of the exemptions described in section 4(c).

Subsection (8)(D) creates an exemption for "any insurance agency activity which was engaged in by *the* bank holding company or any of its subsidiaries on May 1, 1982." In this context, the definite article "the" can *only* refer to the particular bank holding company whose right to proceed with activities otherwise prohibited under section 4(a) is being determined. No other interpretation makes sense. Therefore, as neither Sovran nor MNC was engaged in insurance activity on May 1, 1982, neither falls within the clear terms of this exemption. To be sure, the bank holding companies acquired by Sovran and MNC would qualify for the exemption. This fact cannot be relevant to determining whether Sovran and MNC are also exempt, however, unless the phrase "*the* bank holding company" is read to mean "*any* bank holding company."

The majority concludes that such a reading is reasonable because the case should not depend on "what might be thought to be a fortuitous choice of an article." Majority Opinion ("Maj.Op.") at 287–88. I disagree. If a statute is unambiguous, as it is in this case, judicial inquiry is normally complete. *K Mart Corp. v. Cartier, Inc.,* — U.S. ——, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). I see no reason to dismiss perfectly clear language defining the subset of bank holding companies eligible for a subsection 8(D) exemption because of a surmise that, in this instance, Congress might not have chosen its words with sufficient care.

There are occasions where the Supreme Court has permitted "the" to be construed as something other than a definite article. In *Citizens & Southern National Bank v. Bougas,* 434 U.S. 35, 98 S.Ct. 88, 54 L.Ed.2d 218 (1977), for example, the Court held that a venue statute providing that a bank may be sued in "the" district in which the bank is located did not necessarily re-strict actions to a single district. In that case, however, the Court determined that such an interpretation was required because the statute elsewhere provided for venue wherever a bank is "located." 434 U.S. at 38–44, 98 S.Ct. at 90–93. There is no similar tension in this case, where the plain meaning of the definite article ("the bank holding company") is wholly consistent with the statute's purpose in specifying which bank holding companies may acquire or retain a company engaging in an otherwise proscribed activity.

Nor do the citations to the legislative history with which the Board sought to buttress its interpretation require that we ignore the plain meaning of the specific language used by Congress. The Board and the majority both rely on the Senate Report, which describes the function of subsection 8(D) as permitting bank holding companies that "have been engaged or have received approval to engage in the insurance business to expand such business, within reasonable limits." S.Rep. No. 536, 97th Cong., 2d Sess. 39 (1982). While the majority describes this extract as an endorsement for the sort of "measured growth" that would flow from the Board's interpretation, Maj.Op. at 289, I fail to see how the passage is in any way inconsistent with my interpretation of Exemption D or how it can be read to override the unambiguous language chosen by Congress to confine its reach. *Burlington N. R.R. Co. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987).

In the absence of any compelling reason to conclude otherwise, we are required both by comity and the rules of construction to presume that Congress meant what it said.