SOUTHEAST SHIPYARD
ASSOCIATION, et al.

v.

UNITED STATES of America, et
al., Pacific King Fisheries,
Inc., Appellants.

SOUTHEAST SHIPYARD
ASSOCIATION, et al.

v.

UNITED STATES of America, et
al., Pacific King Fisheries,
Inc., Appellants.

SOUTHEAST SHIPYARD
ASSOCIATION, et al.

v.

UNITED STATES of America,
et al., Appellants.

Nos. 92-5014, 92-5027 and 92-5058.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 1, 1992.

Decided Nov. 24, 1992.

Steve Frank, Attorney, Dept. of Justice, Washington, D.C., argued the cause for the appellants, U.S., et al. With him on the briefs were Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Barbara C. Biddle, Attorney, Dept. of Justice, Washington, D.C.

Boris Feldman, Palo Alto, Cal., argued the cause for the appellant, Pacific King Fisheries, Inc. With him on the briefs were Michael J. Danaher, Jotham S. Stein and Sallie Kim, Palo Alto, Cal.

E. Alexander Blanton, Washington, D.C., argued the cause for appellees. With him on the brief were Michael Joseph and Joseph O. Click, Washington, D.C.

William N. Myhre, John Longstreth and Phyllis D. Carnilla, Washington, D.C., were on the brief, for amicus curiae, The Ass'n of U.S. Factory Trawlers.

Before: MIKVA, Chief Judge, RUTH BADER GINSBURG and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

A vessel can have a nationality. United States ships gain their status through an administrative system of "documentation." The system dates to the beginning of the nation, when the first Congress adopted statutes corresponding to those in force in England under the reign of George III. *See* III J. KENT, COMMENTARIES ON AMERICAN LAW 105 (1828). Today, as then, a vessel's certificate of documentation may contain one or more licenses, known as "endorsements," permitting certain commercial operations. 46 U.S.C. § 12103. United States ships engaged in trade with foreign nations are "registered" and possess a "registry endorsement." Those engaged in trade between points in the United States possess a license known as a "coastwise endorsement." United States ships engaged in the Great Lakes trade have a "Great Lakes endorsement." Those engaged in fishing possess a "fishery endorsement." 46 U.S.C. §§ 12105–12108.

■ Under federal maritime law, the eligibility of a vessel for a particular endorsement turns on the vessel's activity, its ownership and where the vessel was built or rebuilt. *See generally Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 272–74, 97 S.Ct. 1740, 1745–46, 52 L.Ed.2d 304 (1977). The issue in this case focuses on the qualifications for a fishery endorsement, as modified by the Commercial Fishing Industry Vessel Anti–Reflagging Act of 1987, Pub.L. No. 100–239, 101 Stat. 1778 (1988), and the effect of a savings clause in the Act exempting some vessels from compliance with a provision regarding ownership.

## I

The importance of a fishery endorsement increased with the enactment of the Fishery Conservation and Management Act of 1976, Pub.L. No. 94–265, 90 Stat. 331. Commonly called the Magnuson Fishery Conservation and Management Act, the legislation gave United States flag ships priority to harvest and process fish, other than those which are highly migratory (16 U.S.C. §§ 1811(a), 1812), within 200 nautical miles "from the baseline from which the territorial sea is measured." Pub.L. No. 94–265, Title I, § 101, 90 Stat. 336. This vast area, far larger than the land territory of the United States, is now known as the "exclusive economic zone," a designation derived from Presidential Proclamation No. 5030, 48 Fed.Reg. 10,605 (1983). *See* Comment, *The Exclusive Economic Zone: Its Development and Future in International and Domestic Law*, 45 LA.L.REV. 1269 (1983). Despite the "exclusive" in the zone's title, foreign flag vessels are not, in theory, completely barred from harvesting or processing fish within the region. Under a conservation management system too complicated to describe here, permits to foreign vessels may issue if the total optimum yield for a particular species will be more than that harvested by American fishing vessels. *See generally* W. McLean & S. Sucharitkul, *Fisheries Management and Development in the EEZ: The North, South, and Southwest Experience*, 63 NOTRE DAME L.REV. 492 (1988). One of the goals of the Magnuson Act was to encourage the growth of the United States commercial fishing industry. Under the Act's allocation system, Congress supposed that as domestic fishing expanded, foreign involvement would diminish.

The Magnuson Act did not deal with the possibility that foreign interests, faced with restrictions on foreign flag vessels fishing in the Zone, might reflag their vessels in the United States or gain control of American corporations owning American-flag fishing vessels. Both options were open. At the time, a certificate of documentation with a fishery endorsement was needed only for harvesting fish. Fish processing vessels, and apparently fish tender vessels,[1] could operate under a registry endorsement, which was the easiest to ob-

---

1. A "fish tender vessel" is a "vessel that commercially supplies, stores, refrigerates, or transports fish, fish products, or materials directly related to fishing or the preparation of fish to or from a fishing, fish processing, or fish tender vessel or a fish processing facility." 46 U.S.C. § 2101(11c).

tain. *See Douglas v. Seacoast Products, Inc.,* 431 U.S. at 274, 97 S.Ct. at 1746. A foreign-built vessel held by a United States corporation wholly owned by foreign interests could be registered. *See* J. Walsh & J. Weinstein, *Foreign Investment in the U.S. Fishery Industry After the Anti–Reflagging Act of 1987,* 22 INT'L LAW. 1207, 1208 (1988). The qualifications for a fishery endorsement, needed for vessels engaged in fish harvesting, also allowed room for foreign influence. Although the vessel had to be built in an American shipyard and owned by American citizens, corporations were considered citizens of the country in which they were incorporated. A vessel owned by an American corporation controlled by foreigners would therefore be eligible for a fishery endorsement so long as the corporation's president and chairman of the board of directors, and a sufficient number of its directors were United States citizens. *Id.* [2]

As then-General Counsel of the Department of Transportation, John Hart Ely, pointed out, the Magnuson Act thus did "not absolutely eliminate foreign fishing interests." Letter to Rep. Leonor K. Sullivan, quoted in E. Fidell, *Enforcement of the Fishery Conservation and Management Act of 1976: The Policeman's Lot,* 52 WASH.L.REV. 513, 521 n. 37 (1977). It was not until passage of the Anti–Reflagging Act of 1987 that Congress legislated on the subject. The Anti–Reflagging Act required fish processing and fish tender vessels to obtain a fishery endorsement, 46 U.S.C. § 12101(a)(1), and provided that vessels rebuilt on or after July 28, 1987, could retain eligibility only if an American shipyard did the rebuilding, 46 U.S.C. § 12108 note. Of importance here, the Anti–Reflagging Act altered the eligibility of fishing vessels owned by American corporations: "A vessel owned by a corporation is not eligible for a fishery endorsement under section 12108 of this title unless the controlling interest (as measured by a ma-

jority of voting shares in that corporation) is owned by individuals who are citizens of the United States." 46 U.S.C. § 12102(c)(1).

A savings clause in the Anti–Reflagging Act, the meaning of which is in dispute, ameliorated the impact of the citizen control requirement just quoted. The clause reads:

> [The citizen control requirement] applies to vessels issued a fishery license after July 28, 1987. However, that [requirement] does not apply if before that date the vessel—
>
> (1) was documented under chapter 121 of title 46 and operating as a fishing, fish processing, or fish tender vessel in the navigable waters of the United States or the Exclusive Economic Zone; or
>
> (2) was contracted for purchase for use as a fishing, fish tender, or fish processing vessel in the navigable waters of the United States or the Exclusive Economic Zone, if the purchase is shown by the contract or similarly reliable evidence acceptable to the Secretary to have been made for the purpose of using the vessel in the fisheries.

46 U.S.C. § 12102 note.

The citizen control requirement of the Anti–Reflagging Act applied retroactively, to vessels issued a fishery endorsement after July 28, 1987. 46 U.S.C. § 12102 note. After receiving inquiries about the meaning of the savings clause, the United States Coast Guard, which is in charge of documenting vessels, instituted a rulemaking concerning this subject and other questions raised by the Anti–Reflagging Act. 53 Fed.Reg. 41,211 (1988); 54 Fed.Reg. 41,992 (1989). The final rule interpreting the savings clause, promulgated on December 12, 1990, provides that a United States corporation meeting the pre-existing requirements regarding the citizenship of its president and board of directors (*see supra* note 2), but not satisfying the newly-enacted

---

**2.** The corporation owning the vessel must be "established under the laws of the United States or of a State." 46 U.S.C. § 12102(a)(4). The "president or other chief executive officer and chairman of its board of directors" must be

American citizens. *Id.* Non-citizens may not comprise more than "a minority of the number necessary to constitute a quorum" of the board of directors. *Id.*

citizen control requirement, may nevertheless be eligible for a fishery endorsement if "prior to July 28, 1987, the vessel" came within subsection (1) or (2) of the savings clause (46 U.S.C. § 12102 note). 55 Fed. Reg. 51,252 (1990). The effect of the regulation, the preamble stated, was to make the exemption granted by the savings clause "run with the vessel." 55 Fed.Reg. at 51,248.

Certificates of documentation containing fishery endorsements are routinely renewed on a yearly basis if no changes have occurred. When a ship is sold, new documentation must be issued. 46 C.F.R. §§ 67.23–3(a)(1), 67.25–7. Under the Coast Guard's interpretation of the savings clause, vessels acquired by corporations after July 27, 1987, would not have to comply with the citizen control provision in order to receive a certificate of documentation containing a fishery endorsement so long as the vessel, before that date, had been operating as a fish processor, fish harvester or fish tender within the Zone and had been properly documented—a "grandfathered" vessel. 46 C.F.R. § 67.03–15.

This lawsuit began on May 16, 1990, before the Coast Guard's final rule had been published but after the Coast Guard, on the basis of the interpretation later embodied in its regulation, had issued new fishery endorsements to two ships, the RESOLUTE and the NORTHERN HERO. The RESOLUTE had been owned on July 27, 1987, by a corporation controlled by American citizens; on March 18, 1988, the RESOLUTE was sold to a United States corporation that did not satisfy the citizen control requirement of the Anti–Reflagging Act. The NORTHERN HERO also had been owned by an American corporation controlled by citizens of this country. It was sold after July 28, 1987, to another corporation in which non-citizens later acquired a controlling interest. Plaintiffs include, among others,[3] United States companies controlled by citizens of this country who own vessels engaged in fishing within the exclusive economic zone. Claiming that the Coast Guard had misinterpreted the savings clause, they sought declaratory and injunctive relief cancelling the fishery endorsements granted to the RESOLUTE and the NORTHERN HERO and any other similarly situated vessels.

On cross-motions for summary judgment, the district court ruled that the savings clause did not attach to vessels and thus did not permit the transfer of "grandfathered vessels to noncitizen-controlled corporations." *Southeast Shipyard Ass'n v. United States,* No. 90–1142, slip op. at 8–9 (D.D.C. Apr. 30, 1991). The Coast Guard's contrary interpretation, the court stated, would "effectively obliterate[ ] the primary purpose of the Anti–Reflagging Act," which the court identified as promoting "the continued orderly growth, development, and competitiveness of the U.S. fishing and fish processing industry...." *Id.*

## II

▮ Vessels, not owners, are either eligible or ineligible for documentation under federal maritime law. Endorsements are issued to vessels. *See, e.g.,* 46 U.S.C. §§ 12106(d)(1), 12108(c). After July 28, 1987, a "vessel owned by a corporation" is ineligible for a fishery endorsement unless United States citizens control the corporation. 46 U.S.C. § 12102(c)(1). If a fishing vessel were to be exempted from this condition, one would expect the exemption also to be framed in terms of the vessel. The savings clause so reads. By its terms the clause, which follows immediately after the citizen control requirement in the law as originally enacted, § 7(a) & (b), 101 Stat.

---

**3.** The others are two associations representing domestic shipyards. They challenged the documenting of the NORTHERN HERO on the ground that the Coast Guard failed to investigate the foreign rebuilding of the ship, which they alleged disqualified it from eligibility for a fishery endorsement under the Anti–Reflagging Act's domestic rebuilding requirements. 46 U.S.C. § 12108(a)(3).

In response to the Coast Guard's motion for clarification, filed after the district court had rendered its original opinion and order, the court issued an order concerning the rebuilding question which neither party has appealed. *Southeast Shipyard Ass'n v. United States,* No. 90–1142 (D.D.C. Jan. 14, 1992).

1782–83, extends to "the vessel," rather than the corporate owner.

■ To give the savings clause the meaning plaintiffs ascribe to it—that a "grandfathered" vessel will lose its exemption from § 12102(c)(1) if it is sold to another corporation after July 28, 1987, or if the ownership of the corporation holding title to the vessel later changes—would require many additional words to be read into the statute. On its face the clause makes nothing turn on who holds title to the vessel in the future. The criteria mentioned in the clause relate back, not forward. Whether a ship is grandfathered depends on what documentation had been issued to it before July 28, 1987; the use to which the ship had been put prior to that date; and where the ship had been operating. In statutory terms, the citizen control requirement will not render a vessel ineligible for a fishery endorsement in the future if, before July 28, 1987, "the vessel" "was documented under chapter 121 of title 46," the vessel was "operating as a fishing, fish processing, or fish tender vessel," and the vessel was engaging in these activities "in the navigable waters of the United States or the Exclusive Economic Zone." 46 U.S.C. § 12102 note.

This is the interpretation of the savings clause the Coast Guard followed when it enrolled the RESOLUTE and the NORTHERN HERO, and it is the interpretation reflected in the Coast Guard's regulations issued after this lawsuit began. "This construction is really so obvious and inevitable, that the endeavor to make it more clear, would seem to be a total misapplication of time." *United States v. Willings & Francis*, 8 U.S. (4 Cranch) 48, 56, 2 L.Ed. 546 (1807) (Marshall, C.J.). The argument against it proceeds not from the language of the savings clause, but from a statement in a House Report and from the perceived policy of the Anti–Reflagging Act.

The Report of the House Committee on Merchant Marine and Fisheries states: "The savings clause in subsection (b) does not apply in the event that the ownership or operational control of a vessel protected under the provisions of subsection (b) changes in whole or in part. In such an instance, the controlling interest provisions of subsection (a) would apply." H.R.REP. No. 423, 100th Cong., 1st Sess. 17 (1987), U.S.Code Cong. & Admin.News 1987, pp. 3245, 3258. This passage, contained in the section-by-section analysis portion of the Report, contradicts the Coast Guard's interpretation making the exemption run with the ship. The precise extent of the contradiction is uncertain. The Report indicates that if the "ownership ... of a vessel" changes "in whole or in part," the vessel loses its grandfathered status. Suppose a United States corporation owning a grandfathered vessel on July 28, 1987, continued to own the vessel thereafter, but the identities of the corporation's shareholders changed. This could occur through the sale of a single share of stock. Would that constitute a change of "ownership ... of a vessel" "in part"? Even if a United States citizen happened to be the purchaser? *Cf. The Tanamo*, 83 F.2d 161 (2d Cir.1936). Or did the Committee mean that the grandfathered status of the vessel ends only when the American corporate owner sells the vessel to another American corporation? (If the sale were to a foreign corporation, the vessel could not be documented regardless of whether the citizen control provision applied.) And what of a grandfathered vessel mortgaged to a United States corporation under foreign control? *Compare* 46 U.S.C. § 31322. Would foreclosure after July 28, 1987, destroy the vessel's grandfathered status and thus presumably some of its value?

We do not attempt to answer these questions and the many others this passage in the House Report raises. The district court did not mention the quoted sentences, the Coast Guard did not rely on them, and we attach no importance to them. The Supreme Court has often stated that statutory language might not be conclusive if there is a "clearly expressed legislative intention to the contrary," *Consumer Product Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980), to which the Court usually adds two propositions: this would be a "rare and exceptional" circumstance, *De-*

*marest v. Manspeaker*, 498 U.S. 184, 186, 111 S.Ct. 599, 604, 112 L.Ed.2d 608 (1991); *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981); *see also Estate of Cowart v. Nicklos Drilling Co.*, —— U.S. ——, ——, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992); and Congress expresses itself in the language of the statute. *Ardestani v. INS*, —— U.S. ——, ——, 112 S.Ct. 515, 520, 116 L.Ed.2d 496 (1991); *INS v. Cardoza–Fonseca*, 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987). We will assume the two sentences in the House Report qualify as a "clearly expressed" intention contrary to the meaning of the words of the savings clause. But as discussed next, the passage does not amount to a "legislative intention" or an expression of Congress.

The citizen control requirement, and the savings clause accompanying it, were not in the version of H.R. 2598 submitted to the House Committee on Merchant Marine and Fisheries. The Committee added these provisions during its markup session, after Representative Young of Alaska offered them as an amendment. H.R.REP. No. 423, *supra*, at 9, 12–13. According to the Committee, the "primary purpose" of the bill dealt with another subject, namely, prohibiting the documentation of foreign-built fish processing vessels as vessels of the United States. *Id.* at 4. When the amended version of H.R. 2598 reached the House floor on November 9, 1987, Representative Young stated with respect to the citizen control requirement that "there are indications that the other body"—the Senate—"is unwilling to accept this language." 133 CONG.REC. 31,364 (1987). The House then passed the amended bill and sent it to the Senate.

On the Senate floor, Senator Hollings introduced an "amendment in the nature of a substitute" for the House version of H.R. 2598, the details of which are unnecessary to describe. Senator Hecht then offered an "amendment to the amendment" identical to the citizen control requirement and savings clause in the House bill. After Senator Murkowski spoke in favor of the amendment to the amendment, it "was agreed to." 133 CONG.REC. at 36,059. No

Senate Report accompanied either measure. Although Senator Hollings submitted a section-by-section analysis of his substitute, no one offered any such analysis of the amendment to the amendment. During the floor debate, Senator Adams confessed to "having serious concerns about [the citizen control requirement]"; pointed out that "[n]o hearings were ever held in the Senate on the effect of this new restriction on our industry"; and wondered "why it is important to restrict foreign investment in fishing vessels; but not to apply [the] same new restrictions to the shore-based processing industry, some of which is completely foreign owned." *Id.* Senator Breaux expressed similar misgivings. He stated that foreign investment had contributed to the development of the Louisiana fishery and worried that restrictions on the flow of foreign capital "into the U.S. fishery industry will impede the rapid and full development of this industry that we all desire to achieve nationwide." 133 CONG.REC. at 36,-058. Both Senator Adams and Senator Breaux indicated that they would nevertheless support the legislation, but hoped to examine the citizen control issue in the next session. 133 CONG.REC. at 36,058–59.

After a third reading, the bill passed the Senate. H.R. 2598 returned to the House on December 21, 1987. 133 CONG.REC. at 36,747. The House passed the bill with modifications not pertinent here. 133 CONG.REC. at 36,751. The Senate concurred in the House amendments one day later. 133 CONG.REC. at 37,955.

In light of this history, the two sentences in the House Report, quoted above, cannot be considered an expression of Congress about the meaning of the savings clause. By the time H.R. 2598 reached the House floor, the House Report had been printed. Members of the House could have read it before they voted. But H.R. 2598 came before the Senate without an accompanying committee report. The House Report was a public document and Senators doubtless could have obtained copies of it. But it would be pure speculation to suppose that any Senator went to this trouble. From all that appears in the legislative

record, the members of the Senate had only the language of the citizen control requirement and the savings clause to study. As we have said, the House Report ascribed to the savings clause a meaning not apparent from its face, a meaning no one would suspect after reading the clause and the statute as a whole. The clause contains nothing even remotely directed to the effect of a sale of a grandfathered vessel or a change in the ownership of the corporation holding title to it. Only those who reviewed the House Report before voting on the bill would have wondered whether the protection extended by the clause ceased upon the happening of events about which the clause was silent. Yet there is nothing to indicate that any significant number of Senators even considered the House Report, let alone shared its view of the savings clause. The Report, in short, cannot be considered an expression of legislative will.

This brings us to the district court's reasoning on the basis of the "policy" of the Anti–Reflagging Act. The district court derived the Act's policy from a portion of the House Report (H.R. REP. No. 423, *supra*, at 4) stating, with the brackets and ellipses inserted by the court (slip op. at 8):

> The primary purpose of [the Anti–Reflagging Act] is to prohibit the reflagging of foreign-built processing vessels and "vessels of the United States" for operation in domestic fisheries under the Magnuson Act. Specifically, the [Anti–Reflagging] Act increases domestic control over the fisheries resources.... By prohibiting the documentation of foreign-built processing vessels as a "vessel of the United States" ... [the Anti–Reflagging Act] furthers the fundamental purposes of the [Magnuson] Act by displacing foreign-built with domestically built fishing industry vessels in U.S. fisheries.

From this the court extrapolated. Congress, the court believed, wanted to phase out vessels owned by non-citizen controlled corporations and engaged in fishing in the exclusive economic zone. We will accept the court's description of the Act's policy although the quotation from the House Report, which deals with foreign-built pro-

cessing vessels rather than citizen control of corporations, does not exactly support it. The Coast Guard's interpretation of the savings clause would defeat this policy, the court reasoned, because there are now 29,-000 grandfathered fishing vessels, each of which could have its life extended indefinitely through rebuilding. In the court's words, the phase out would be very slow, so slow that it would have to be measured in "geological time" (slip op. at 10).

Justice Holmes answered a similar objection thus: "It is not unknown, when opinion is divided, that qualifications sometimes are inserted into an act that are hoped to make it ineffective." *United States v. Plowman*, 216 U.S. 372, 375, 30 S.Ct. 299, 300, 54 L.Ed. 523 (1910) (Holmes, J.). "But," Justice Holmes quickly added, "the objection is stated too strongly." *Id.* So here. The Coast Guard's interpretation does not render the Anti–Reflagging Act, or the citizen control requirement, ineffective. According to a study the district court cited, approximately "29,000 vessels were licensed for catching fish" as of the savings clause cutoff date. UNITED STATES GENERAL ACCOUNTING OFFICE, REPORT TO THE HONORABLE BOB PACKWOOD, U.S. SENATE, COAST GUARD: ANTI-REFLAGGING ACT HAS MIXED IMPACT ON U.S. FISHING AND SHIP REBUILDING 5 (1990). Yet the Coast Guard documented 2,000 new fishing vessels during the two years immediately following passage of the Act, which indicates that the transition is under way. *Id.* Furthermore, since rebuilding must be done in the United States, and since the savings clause may serve as an incentive to rebuild grandfathered vessels, the Coast Guard's interpretation is consistent with the long, "unabashedly protectionist," tradition of federal maritime law "to provide work for American shipyards." *Marine Carriers Corp. v. Fowler*, 429 F.2d 702, 708 (2d Cir.1970).

We may agree that interpreting the savings clause so that the exemption runs with the vessel puts it in tension with the policy the district court identified. But "[g]randfather rights are always in tension with the legislative rule to which they are an exception." *National Ass'n of Casualty &*

*Surety Agents v. Board of Governors of the Federal Reserve System*, 856 F.2d 282, 289 (D.C.Cir.1988), *cert. denied*, 490 U.S. 1090, 109 S.Ct. 2430, 104 L.Ed.2d 987 (1989). What of the policy of the savings clause? We think the Coast Guard had it right when it said the clause was aimed at "protect[ing] the financial interests of vessel owners" and that "these financial interests are not fully protected if the vessel loses fishing privileges when it is sold." 54 Fed.Reg. 41,994 (1989). Whether the clause gives too much protection; whether too many ships retain grandfathered status; whether, as a result, the phase out will take too long—are, for the judiciary, imponderables. We can say only that the savings clause, as written, makes the exemption from the citizen control requirement run with the ship.

The judgment of the district court is reversed.