**RAILWAY LABOR EXECUTIVES'
ASSOCIATION, et al.,
Appellants,**

v.

**NATIONAL MEDIATION BOARD, et al.**

Nos. 91–5223, 91–5310.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 25, 1992.

Decided March 9, 1993.

·John O'B. Clarke, Jr., with whom L. Pat
Wynns was on the brief, for appellants.
William G. Mahoney, Washington, DC, en-
tered an appearance for appellants.

Edward T. Swaine, Atty., Dept. of Jus-
tice, with whom Ronald M. Etters, Gen.
Counsel, Nat. Mediation Bd., and Barbara
C. Biddle, Washington, DC, Atty., Dept. of
Justice, were on the brief, for appellee Nat.
Mediation Board.

Richard T. Conway, Washington, DC,
Thomas J. Knapp, and Lawrence M. Stroik,
Fort Worth, TX, filed a brief, for appellees

Burlington Northern R.R. Co. and Nat. Ry. Labor Conference.

Before: EDWARDS, RUTH BADER GINSBURG, and WILLIAMS, Circuit Judges.

Opinion for the court filed by Circuit Judge RUTH BADER GINSBURG.

Concurring opinion filed by Circuit Judge HARRY T. EDWARDS.

Dissenting opinion filed by Circuit Judge STEPHEN F. WILLIAMS.

RUTH BADER GINSBURG, Circuit Judge:

In response to the increase in railroad mergers and consolidations in the 1980s, the National Mediation Board (NMB or Board) changed its approach to the certification—and decertification—of collective bargaining representatives for railroad employees. To assume a more active role, and to allow employer involvement, the Board revised its interpretation of the governing Railway Labor Act (RLA or Act) prescription, Section 2, Ninth, 45 U.S.C. § 152 Ninth. In the two cases before us, unions representing railroad workers challenge the NMB's current reading of Section 2, Ninth as patently incorrect and an arrogation of authority Congress did not give to the Board. The district court dismissed both suits on the ground that the challenged Board actions are not reviewable in court.

We reverse the district court's decisions and remand the cases for the entry of declaratory judgments in favor of the unions. Section 2, Ninth, as Congress shaped the provision, does not bear the new construction the Board has placed upon it. Satisfied that the NMB has created action-initiating roles for employers and for itself without legislative license, we explain in

this opinion why judicial review is available in this exceptional instance.

## I. BACKGROUND

In the 1930s, principally to prevent disputes between carriers and unions from disrupting transportation by rail, Congress amended the Railway Labor Act to create the National Mediation Board. Mediation of labor disputes in the railroad industry is the Board's main function. The RLA assigns to the Board, as an ancillary function, responsibility for the resolution of disputes concerning union representation for a rail carrier's employees. The dispositive provision of the Act, Section 2, Ninth, instructs that, "upon request of either party" to a dispute "among a carrier's employees" over the identity of their collective bargaining representative, the Board shall investigate and certify the result. Since the Board's creation in the 1930s and until the actions challenged here, the Board has conducted Section 2, Ninth certification (or representation) investigations in the railroad industry only at the request of the involved employees or organizations representing them.

In 1989, in response to an increase in railroad mergers and consolidations, the Board published new procedures delineating a more active approach to certification determinations. *See Procedures for Handling Representation Issues Resulting from Mergers, Acquisitions or Consolidations in the Railroad Industry*, 17 N.M.B. 44 (1989) (the *Merger Procedures* ).[1] As explained in these *Merger Procedures*, "[i]t is the Board's longstanding practice ... to certify only unions that represent the majority of a system-wide class of employees," that is, only unions that represent the majority of all persons doing the same job throughout an entire (integrated) company. *Id.* at 46 (construing Section 2, Fourth of the RLA). Mergers and consolidations, the

---

1. Two years earlier, the Board similarly revised its procedures for the *airline* industry. *See* Procedures for Handling Representation Issues Resulting from Mergers, Acquisitions or Consolidations in the Airline Industry, 14 N.M.B. 388 (1987). In *International Bhd. of Teamsters v. NMB,* 118 Lab.Cas. (CCH) ¶ 10,678 (D.D.C.1990),

the district court held that the Board's altered course for airline mergers was not subject to judicial review. That decision was not appealed. The district court in the instant case referred to, and expressed agreement with, the dismissal of the challenge to the new procedures for the airline industry.

Board recognized, combine once separate groups of employees into a single integrated workforce, and may therefore generate "question[s] as to who is the authorized or designated [employee] representative." *Id.*

The *Merger Procedures* were designed to facilitate the Board's prompt response to, and resolution of, merger-sparked representation questions. *See id.* at 47. Specifically, where the old procedures required the Board to wait until the employees became dissatisfied with the new situation and brought a dispute to the Board's attention, the *Merger Procedures* allow the Board to act at the request of a carrier or on the Board's own initiative.[2] As explained by the NMB's counsel at oral argument, the Board sought an "orderly procedure" that would allow the NMB to "anticipate" and "prevent chaos," rather than "react" to it. The Board rested its authority to install invigorated procedures on Section 2, Ninth. *See id.* at 44, 48–49.

The Railway Labor Executives' Association and numerous national labor unions (collectively RLEA) challenged the Board's authority under Section 2, Ninth, to promulgate the *Merger Procedures.* The district court dismissed the suit for want of judicial authority to review the Board's action. *See Memorandum Opinion, Railway Labor Executives' Ass'n v. NMB,* No. 89–3306 (D.D.C. June 4, 1991); *Order, Railway Labor Executives' Ass'n v. NMB,* No. 89–3306 (D.D.C. July 2, 1991).

Burlington Northern Railroad Co. (Burlington) was involved in various mergers and consolidations between 1970 and 1985. Invoking the Board's new procedures, Bur-

lington asked the Board to investigate the effect these mergers may have had on earlier employee representation certifications. The Board investigated over eighty certifications, extinguishing those involving defunct railroads and issuing new ones on Burlington. *See In re Merger of Northern Pacific Ry.,* 18 N.M.B. 240 (1991). Maintaining that the NMB could investigate representation questions only upon request of employees or their representatives, RLEA sued both the Board and Burlington. Again, the district court dismissed the case on the ground that the Board's decision was unreviewable. *See Order, Railway Labor Executives' Ass'n v. NMB,* No. 91–1135 (D.D.C. Sept. 12, 1991). In both of these rulings, the district court relied on the line of cases headed by *Switchmen's Union v. NMB,* 320 U.S. 297, 305, 64 S.Ct. 95, 99, 88 L.Ed. 61 (1943) (holding that Congress intended a Section 2, Ninth dispute between labor organizations, as to representation of a carrier's employees for collective bargaining purposes, "to reach its last terminal point when the administrative finding [is] made. There [is] to be no dragging out of the controversy into other tribunals of law.").

█ In this appeal, RLEA argues that the unambiguous text of Section 2, Ninth imposes two unyielding, essentially jurisdictional restraints: Board authority to investigate a certification exists *only* when a "party" calls a "dispute"[3] to the Board's attention; only the *employees* (or their representatives) involved in the dispute qualify

2. The *Merger Procedures* provide that carriers "may invoke the Board's services for a determination of the post-merger status of any NMB certifications on the applicable properties." *See* Procedures for Handling Representation Issues Resulting from Mergers, Acquisitions or Consolidations in the Railroad Industry, 17 N.M.B. 44, 53–54 (1989) (the *Merger Procedures* ). RLEA also asserts, without contest, that the Board has assumed authority to act on its own initiative. Under the new procedures, carriers must notify the Board when a merger is imminent, and include in the submission to the NMB "a complete copy of the carrier's merger application to the Interstate Commerce Commission." *Id.* at 50. "Carriers which have previously merged may [also] notify the NMB that the merger had

occurred." *Id.* The Board, once informed of a merger, will investigate to determine whether the merging or merged carriers constitute "a single transportation system"; "[a]fter investigation, the Board will issue a decision concerning the status of the certifications on the merged carrier." *Id.* at 51. The Board's decision may effect the termination of "certification(s) on the acquired carrier." *Id.*

3. RLEA also argues that the Board acted in the absence of a "dispute" meet for NMB resolution. To the extent that this argument tenders a discrete question, our disposition renders the issue moot.

as "parties." The Board[4] responds, first, that its Section 2, Ninth reading is immune from judicial review. Alternately, justifying its construction, the Board asserts that Section 2, Ninth describes when the NMB *must* investigate, but does not limit, and therefore leaves open for Board decision, when it *may* do so.[5]

## II. DISPOSITION

### A. *Reviewability*

In *Switchmen's Union v. NMB*, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943), the Supreme Court held that the Board's certification of representatives for collective bargaining pursuant to Section 2, Ninth was not judicially reviewable. *Switchmen's Union* was a run of the road Section 2, Ninth case, a dispute resolved by the Board between two labor organizations over the representation of yardmen on lines operated by the New York Central system. The decision homed in on "the type of problem involved," and the Court cautioned that "[g]eneralizations as to when judicial review of administrative action may or may not be obtained are of course hazardous." *Switchmen's Union*, 320 U.S. at 301, 64 S.Ct. at 97.

■ Courts have endeavored, after *Switchmen's Union*, to distinguish run of the road cases in which judicial review is not available from exceptional instances in which a court check is in order. It is settled that, when a dispute "arise[s] among a carrier's employees," 45 U.S.C. § 152 Ninth, then, "so long as the Board is acting with the purpose of 'find[ing] the fact' as to who is the employees' representative," court review is precluded. *See America West Airlines v. NMB*, 969 F.2d 777, 781 (9th Cir.1992) (quoting *Switchmen's Union*, 320 U.S. at 305, 64 S.Ct. at 99). "On the other hand, when the Board acts in excess of its statutory authority,

judicial review may be available." *Id.* at 781. A stock formulation describes court oversight as confined to instances of the Board's "gross violation" of the RLA. *See International Ass'n of Machinists v. Trans World Airlines*, 839 F.2d 809, 811 (D.C.Cir.) (quoting and affirming 654 F.Supp. 447, 450 (D.D.C.1987)), *amended*, 848 F.2d 232, *cert. denied*, 488 U.S. 820, 109 S.Ct. 62, 63, 102 L.Ed.2d 40 (1988).

In related administrative action settings, courts have used a variety of formulas to describe exceptional cases in which judicial review may be had despite a statutory regime generally precluding review. *See Leedom v. Kyne*, 358 U.S. 184, 188, 189, 79 S.Ct. 180, 183, 184, 3 L.Ed.2d 210 (1958) (National Labor Relations Board acted "in excess of its delegated powers and contrary to a specific prohibition in the Act"; Board "attempted exercise of power that had been specifically withheld"); *Dart v. United States*, 848 F.2d 217, 222 (D.C.Cir. 1988) ("*Leedom v. Kyne* test ... has been alternatively phrased as whether the agency action 'on its face' violated a statute"); *Hartz Mountain Corp. v. Dotson*, 727 F.2d 1308, 1311 (D.C.Cir.1984) (review consistent with *Leedom v. Kyne* is limited "to instances where the error of the Board is patently an incorrect construction of the Act") (quoting II THE DEVELOPING LABOR LAW 1716 (C. Morris ed., 2d ed. 1983)); *United Food and Commercial Workers v. NLRB*, 694 F.2d 276, 278 (D.C.Cir.1982) (review petitioner must show that Board "disregarded a specific and unambiguous statutory directive"); *Physicians Nat'l House Staff Ass'n v. Fanning*, 642 F.2d 492, 496 (D.C.Cir.1980) (en banc) ("an error of fact or law is insufficient; the Board must have acted without statutory *authority*") (emphasis added), *cert. denied sub nom. Physicians Nat'l House Staff Ass'n v. Murphy*, 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981).

---

**4.** Although we refer in this opinion only to the Board, Burlington makes essentially the same arguments.

**5.** At a few points, the Board seems to rest its authority to promulgate the *Merger Procedures* on an encompassing power it derives from the

Act as a whole. Intelligently, however, the Board does not place heavy weight on this argument. *See Detroit & T.S.L. R.R. v. United Transp. Union*, 396 U.S. 142, 158–59, 90 S.Ct. 294, 304, 24 L.Ed.2d 325 (1969) ("[T]he Mediation Board has no ... mandate to issue regulations construing the Act generally.").

For the reasons set out in the next section, we conclude that the Board's revised interpretation of Section 2, Ninth fits within the exceptional case category. In allowing carriers to trigger representation investigations, and undertaking to engage in such investigations on its own initiative, the NMB has "attempted [an] exercise of power [Congress] withheld." *See Leedom v. Kyne*, 358 U.S. at 189, 79 S.Ct. at 184. In that attempt, the NMB "disregarded a specific and unambiguous statutory directive," *United Food & Commercial Workers*, 694 F.2d at 278, one that reserves to employees the opening call on certification investigations. *See Summit Airlines v. Teamsters Local Union No. 295*, 628 F.2d 787, 793–94 (2d Cir.1980) (observing that Section 2, Ninth permits only employees or organizations representing them to invoke NMB's certification authority). The Board thus has "acted without statutory authority." *See Physicians Nat'l House Staff Ass'n*, 642 F.2d at 496. The NMB's recasting of Section 2, Ninth, moreover, may be viewed "as jurisdictional or nearly so." *See Griffith v. FLRA*, 842 F.2d 487, 493 (D.C.Cir.1988).[6]

■ Before focusing sharply on Section 2, Ninth, we pause to note our disagreement with the Board's principal arguments on preclusion of review. In its brief, the NMB tendered a distinction that reduces to one between Board inaction, or refusal to act, and positive Board action. Board inaction, but not Board action, the NMB urged, could qualify for judicial review. *See* Brief for the Appellee NMB at 18 (*Switchmen's Union* doctrine precluding court review "has not been thought to encompass the circumstance in which the NMB violates the Act by failing to exercise a duty positively imposed by Section 2, Ninth").

At oral argument, the NMB placed heavier reliance on the position that review even of action, as opposed to inaction, would have been in order had the Board transgressed an explicit "shall not" command,

i.e., a "specific prohibition" in the Act. Under this view, if we comprehend it correctly, judicial review of the *Merger Procedures* would be proper if (and only if) Section 2, Ninth were *formulated* in these very words: "The Board shall not undertake a representation investigation unless its authority to do so has been invoked by employees or labor organizations representing them." The Board derives this position from the seminal *Leedom v. Kyne* decision (mentioned *supra* p. 136); there, the Supreme Court upheld district court authority to strike down a particular National Labor Relations Board (NLRB) bargaining unit certification determination, despite a statutory provision generally precluding judicial review of unit certifications. The NLRB certification in *Leedom v. Kyne* contravened a "specific prohibition in the [National Labor Relations] Act," 358 U.S. at 188, 79 S.Ct. at 184, a "shall not" command. *See id.* at 185, 79 S.Ct. at 182 (citing direction in 29 U.S.C. § 159(b)(1) that, ordinarily, NLRB "shall not" combine professional and non-professional employees in a single unit for collective bargaining purposes).

We do not read *Leedom v. Kyne* as dependent upon the "shall not" formulation. Rather, the Court resisted the assumption that Congress meant to negate judicial protection of rights jeopardized by an agency's "attempted exercise of power [Congress] withheld." 358 U.S. at 189, 79 S.Ct. at 184; *see also id.* at 190, 79 S.Ct. at 185 ("This Court cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers."). *Leedom v. Kyne* is key, we agree. However, that decision supports RLEA in this controversy. The prescription at issue explicitly gives employees and their representatives alone the authority to initiate representation proceedings. If RLEA is right, as we hold it is, *see infra* pp. 138–40, that Con-

---

6. We need not decide whether we should accord deference to an agency's construction of an ambiguous jurisdictional statute under *Chevron USA, Inc. v. Natural Resources Defense Council,* *Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), *see United Transp. Union v. U.S.,* 987 F.2d 784, 790 n. 4 (D.C.Cir.1993), because we rely here on the statute's plain meaning.

gress withheld from employers and the Board itself a corresponding right of initiation, then the "judicial protection" accorded in *Leedom v. Kyne* is also in order here.

The Board's arguments distinguishing action from refusal to act, and express "shall not" commands from implicit ones, furthermore, are irreconcilable with this court's reasoning in *Dart v. United States*, 848 F.2d 217 (D.C.Cir.1988). The statute there at issue allowed the Secretary of Commerce to "affirm, modify or vacate" administrative law judge (ALJ) decisions and declared the Secretary's orders "not subject to judicial review." *Id.* at 227 (quoting 50 U.S.C.App. § 2412(c)(1)). The Secretary, in the case presented in *Dart*, did not "affirm, modify or vacate"; instead, he reversed an ALJ decision. We held that the Secretary's *action* was amenable to judicial review. Exercising that review, we ruled that the Secretary lacked authority to reverse the ALJ's decision; the statute, we concluded, conveyed precisely that message, although it did not expressly say: "The Secretary may only affirm, modify or vacate, and shall not reverse, ALJ decisions." As *Dart* illustrates, a statutory proscription may be unspoken, yet entirely plain. *Cf. Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649, 110 S.Ct. 1384, 1390, 108 L.Ed.2d 585 (1990) (a federal statute is not silent on its preemptive effect merely because it fails expressly to state the "truism that States may not pre-empt federal law").

In sum, *Switchmen's Union* instructs that courts may not review the NMB's resolution of a particular dispute among a carrier's employees concerning their representation. Courts may, however, check the NMB's action if the Board has arrogated authority Congress did not give it to revise Section 2, Ninth. The validity of the *Merger Procedures* presents an issue discrete from the facts of any particular case. The issue—who may trigger a Board investigation into employee representation—is essentially jurisdictional and needs to be resolved only once. "[C]ourts can review [issues] of this sort, while still preserving the finality that Congress sought in the vast majority of cases." *Dart*, 848 F.2d at 222.[7]

**B.** *The NMB's Role Under Section 2, Ninth*

The NMB's *Merger Procedures* craft a regime and role for the Board notably different from the design and function Congress delineated for the NMB. That conclusion seems to us unavoidable from the very text of Section 2, Ninth and other provisions of the RLA. The conclusion that the *Merger Procedures* impermissibly change Congress' scheme—a conclusion we derive from the text of Section 2, Ninth and from a comparison of that text with the text of other RLA prescriptions—accords with the legislative history of the Act, basic concerns underlying the legislation, and prior NMB and court decisions.

(i) *The Plain Meaning of Section 2, Ninth.* The RLA provision in controversy reads:

If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated

---

**7.** Our decision is fully consonant with *United States Dep't of Justice v. FLRA*, 981 F.2d 1339 (D.C.Cir.1993), in which we held unreviewable a Federal Labor Relations Authority decision upholding an arbitrator's award. That case involved an allegation that the arbitrator had abused the large remedial discretion entrusted to him. The court explained that it confronted no "facial violation" or "patent misconstruction of the Statute." *See id.* at 1344.

Nor is our ruling in conflict with *Professional Cabin Crew Ass'n v. NMB*, 872 F.2d 456 (D.C.Cir. 1989) (*PCCA*). In that case, the NMB read the *statutory term* "employee," for voter eligibility purposes, to include former strikers. The con-

stricted reading of "employee" urged by appellant in *PCCA*, we observed, had been rejected in the context at issue "[m]ore than a half century ago" as "narrow and too literal." *PCCA*, 872 F.2d at 461 (citing *Nashville, C. & St. L. Ry. v. Railway Employees' Dep't of AFL*, 93 F.2d 340, 342 (6th Cir.1937), *cert. denied*, 303 U.S. 649, 58 S.Ct. 746, 82 L.Ed. 1110 (1938)). The definition of voter-eligible employees challenged in *PCCA* could hardly be characterized as a "gross violation" of the RLA. Here, in contrast, not only is NMB's current interpretation of Section 2, Ninth without historic support, *see infra* pp. 140–41; most fundamentally, the Board can cite no statutory language, no term Congress used, upon which to pin its reconstruction.

and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties ... the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. 45 U.S.C. § 152 Ninth. The "parties," this provision prescribes, are "employees," not carriers. "[U]pon request of either party to the dispute" plainly refers back to "[i]f any dispute shall arise among a carrier's employees." Any arguable ambiguity over whether "parties" might include "carriers" (along with employees or their representatives) [8] is dispelled by Section 2, Ninth's final instruction: the Board is to certify the outcome of its investigation *"to both parties* [to the dispute]," and then "certify the same *to the carrier."* 45 U.S.C. § 152 Ninth (emphasis added). Nor is there any ambiguity or gap to fill concerning the Board's charge: it is to investigate *"upon request of either party." Id.* (emphasis added).

Essentially, the NMB's construction adds to the *duty* Section 2, Ninth assigns to the Board—the obligation to investigate when employees so request—a further, entirely discretionary prescription moored to no statutory language: "The Board *may* undertake certification investigations at the request of a carrier or when the Board otherwise deems it appropriate." *But see Summit Airlines,* 628 F.2d at 793 ("the carrier does not have a 'side' in a dispute over representation and therefore cannot invoke the services of the Board under [Section 2, Ninth]"); *cf. Southeast Shipyard Ass'n v. United States,* 979 F.2d 1541, 1545 (D.C.Cir.1992) ("To give the savings clause the meaning plaintiffs ascribe to it ... would require many additional words to be read into the statute."). "Certainly there is nothing in the Act which can be interpreted as giving the Mediation Board the power to change the plain, literal meaning of the statute." *Detroit & T.S.L. R.R. v. United Transp. Union,* 396 U.S. 142, 159, 90 S.Ct. 294, 304, 24 L.Ed.2d 325 (1969).

Confirming what the text of Section 2, Ninth conveys, other provisions of the Act show that, when Congress intended to refer to the Board or to carriers, it named them. Thus, for example, when a carrier is a party to a "dispute" covered by RLA prescriptions, the Act describes the dispute as one "between a carrier ... and its ... employees." Section 2, Second, 45 U.S.C. § 152 Second (calling for expedited consideration of "[a]ll disputes between a carrier or carriers and its or their employees"); Section 2, Sixth, 45 U.S.C. § 152 Sixth (concerning time and place of conference of representatives "[i]n case of a dispute between a carrier or carriers and its or their employees, arising out of grievances or out of the interpretation or application of agreements"). Section 2, Ninth, in contrast, speaks only of disputes "among a carrier's employees." 45 U.S.C. § 152 Ninth.

Similarly, when Congress meant to accord to the Board discretion to intervene on its own initiative, Congress so specified in the Act. *See, e.g.,* 45 U.S.C. § 155 First ("The Mediation Board *may* proffer its [mediation] services in case any labor emergency is found by it to exist at any time.") (emphasis added). Section 2, Ninth contains no analogous provision granting the NMB discretion to act on its own initiative. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *INS v. Cardoza-Fonseca,* 480 U.S. 421, 432, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987); *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983); *Friends of*

---

**8.** The NMB has allowed unions to apply for the services of the Board under Section 2, Ninth not as "parties" in their own right but, specifically, as authorized representatives of employees. *See*

29 C.F.R. § 1203.2 (1992) ("applications should be accompanied by signed authorization cards from the employees").

*the Earth v. Reilly,* 966 F.2d 690, 694 (D.C.Cir.1992).

(ii) *Legislative History.* The legislative history further portrays Congress' understanding that the Board would investigate certification disputes only at the request of the involved employees. *See* HOUSE COMM. ON INTERSTATE & FOREIGN COMMERCE, TO AMEND THE RAILWAY LABOR ACT, H.R.REP. No. 2243, 74th Cong., 2d Sess. 4 (1936) (explaining that the National Mediation Board investigates "upon request of the employees involved"). We find instructive, in addition to comment on the text Congress passed, certain proposed statutory language Congress *rejected.* The rejected formulation would have accorded party status to carriers, qualifying them to request certification investigations:

> If any dispute shall arise between a *carrier* and a group of its employees as to who are the [proper] representatives of such employees ..., it shall be the duty of the Board of Mediation, *upon request of either party to the dispute,* to investigate such dispute and to certify....

H.R. 7650, 73d Cong., 2d Sess. (1934) (Section 2, Eighth) (emphasis added), *as reprinted in Railway Labor Act Amendments: Hearings Before the Comm. on Interstate & Foreign Commerce,* 73d Cong., 2d Sess. 3 (1934) (1934 Hearings). As the Board once recognized, in face of a proposal to include carriers as parties to certification disputes, Congress deliberately "eliminated [management], as a party, from any such controversy." FIRST ANNUAL REPORT OF THE NATIONAL MEDIATION BOARD 4 (1935); *see Summit Airlines,* 628 F.2d at 794 (noting Congress' "exclusion of carriers from representation proceedings" under Section 2, Ninth).

■ (iii) *Concerns Underlying the Act.* Two particular concerns Congress had at the time it composed the RLA bear on the Act's designation of employees, but not carriers or the Board itself, as initiators of Section 2, Ninth certifications. First, Congress wished to assure that employees would perceive the Board as a detached mediator, not an activator or detector, of their disputes. *See Chicago & N.W. Ry. v.*

*United Transp. Union,* 402 U.S. 570, 580–81 & n. 13, 91 S.Ct. 1731, 1737 & n. 13, 29 L.Ed.2d 187 (1971) (suggesting that Congress carefully composed RLA's provisions to preserve employees' confidence in the Board as a detached, impartial mediator); *see also* 9 THEODORE KHEEL, LABOR LAW § 50.04[1], at 50–10 (1992) ("It is important to understand ... that as a matter of principle the NMB is neither adjudicatory nor prosecutorial. Its major function is ... to assist in the mediation of disputes and to facilitate the settlement of disputes by the parties themselves.").

In addition to shoring up the image of the Board as a detached provider of dispute resolution services to employees, Congress wished to assure that employees and their unions would "be free from employer influence and control." HOUSE COMM. ON INTERSTATE & FOREIGN COMMERCE, TO AMEND THE RAILWAY LABOR ACT OF MAY 20, 1926, H.R.REP. No. 1944, 73d Cong., 2d Sess. 2 (1934). This concern unquestionably encompassed employees' choice of bargaining representatives. *See, e.g., 1934 Hearings* 78–79. An initiating role for carriers might be seen as interfering with employees' autonomy to decide whether and when to reconsider their bargaining representative, just as a self-starting role for the Board might be viewed as compromising the NMB's status as disinterested referee.

(iv) *Prior Agency and Court Interpretations of Section 2, Ninth.* At oral argument, counsel for the Board described as "exactly correct" the court's statement that "[t]he Board has never had a history of *sua sponte* invoking, nor [has it] ever allowed carriers to invoke 2, Ninth." *Cf. NLRB v. United Food & Commercial Workers Union, Local 23,* 484 U.S. 112, 124 n. 20, 108 S.Ct. 413, 416 n. 20, 98 L.Ed.2d 429 (1987) (reviewing court appropriately "consider[s] the consistency with which an agency interpretation has been applied, and whether the interpretation was contemporaneous with the enactment of the statute being construed"). Court decisions confirm that it is not within the duty of the Board to investigate a certification matter absent a request by employees or their representatives. *See, e.g., Brother-*

*hood of Locomotive Firemen v. NMB*, 410 F.2d 1025, 1033 (D.C.Cir.), *cert. denied sub nom. Brotherhood of Locomotive Engineers v. NMB*, 396 U.S. 878, 90 S.Ct. 149, 24 L.Ed.2d 136 (1969); *International Ass'n of Machinists v. Alitalia Airlines*, 600 F.Supp. 268, 275 & n. 8 (S.D.N.Y.1984), *aff'd*, 753 F.2d 3 (2d Cir.1985) (per curiam). Precedent further indicates that the power of employees or organizations representing them "to invoke the [Section 2, Ninth] statutory process is exclusive." *Summit Airlines*, 628 F.2d at 794.[9]

## CONCLUSION

Congress did not empower the NMB to vest in itself or in carriers authority to invoke the NMB's services under RLA Section 2, Ninth. We so conclude based on the unambiguous text of the Act, with which legislative history and precedent are harmonious. Only when a dispute exists among a carrier's employees as to their representative, and one or more disputants invokes the Board's certification jurisdiction, does the Board have authority to act.[10] Courts can determine a controversy of this essentially jurisdictional, one-time only character without trenching on the finality Congress ordered for certifications within Section 2, Ninth's compass. RLEA is therefore entitled to judicial declarations that the *Merger Procedures* and their application in the Burlington merger decision are incompatible with the certification regime established by the RLA.

For the reasons stated, the district court's judgments dismissing these actions are reversed and the cases are remanded

9. The Board cites two cases for the proposition that it has discretion to undertake certification investigations upon carrier request: *Brotherhood of Maintenance of Way Employees v. Grand Trunk W.R.R.*, 961 F.2d 1245, 1246, 1248–50 (6th Cir.1992); *Association of Flight Attendants v. Delta Air Lines*, 879 F.2d 906, 908 (D.C.Cir.1989), *cert. denied*, 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990). These decisions supply no authority for the NMB's position. While both cases arose in the aftermath of carrier-initiated Board action, neither addressed the propriety of that mode of initiation.

10. However sensible the Board's view that stability in labor relations would be promoted by

for the entry of declaratory judgments for appellants consistent with this opinion.

*It is so ordered.*

HARRY T. EDWARDS, Circuit Judge, concurring:

I fully concur in the majority opinion, and write separately only to state that I find perplexing the dissent's purported reliance on *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Taken to its logical extreme, the dissent's position turns *Chevron* on its head, into a doctrine without limits. But *Chevron* is limited: it applies only when an agency is exercising its *delegated* authority. *See Natural Resources Defense Council v. Reilly*, 983 F.2d 259, 266 (D.C.Cir.1993) ("[I]t is only legislative intent to delegate such authority that entitles an agency to advance its own statutory construction for review under the deferential second prong of *Chevron*.") (Edwards, J., joined by R.B. Ginsburg and Williams, JJ.) (quoting *Kansas City v. Department of Housing & Urban Dev.*, 923 F.2d 188, 191–92 (D.C.Cir. 1991)).

In this case, Congress established an explicit scheme for the initiation of representation proceedings before the National Mediation Board ("NMB"), and under that scheme, the NMB has absolutely no delegated authority to initiate a proceeding on its own or on the request of a carrier, or to promulgate rules to achieve these results. The NMB cannot now claim that authority in the name of convenience, any more than

allowing carriers, and the NMB itself, to trigger Section 2, Ninth certification investigations, Congress has not so provided. Unless and until Congress acts, the Board must defer its investigation until affected employees or their representative invoke the NMB's certification authority. We note that Congress has tried out different arrangements in the past, see *generally* Charles M. Rehmus, *Evolution of Legislation Affecting Collective Bargaining in the Railroad and Airline Industries, in* THE RAILWAY LABOR ACT AT FIFTY 1, 4–16 (1977); FIRST ANNUAL REPORT OF THE NATIONAL MEDIATION BOARD 6–7 (1935), and may alter the scheme again. In the meantime, however, the NMB may not serve as surrogate legislator.

the National Labor Relations Board ("NLRB") can claim such authority under the National Labor Relations Act. *See* 29 U.S.C. § 159 (1988) (nowhere indicating that the NLRB has authority to pursue, on its own initiative, questions of employee representation). The absence of "thou shalt not" language is irrelevant, for both the Railway Labor Act and the National Labor Relations Act make it clear that only parties other than the NMB and NLRB are authorized to invoke representation proceedings.

Moreover, the mere existence of an agency does not give it the power to assert authority that Congress has not delegated. It is absurd to suggest that, under the second prong of *Chevron*, there is a statutory "gap to fill" or a statutory "ambiguity" to cure whenever a statute fails to specify some authority that an agency seeks to invoke. This cannot be the meaning of *Chevron*, for it would allow federal agencies to claim limitless authority except in those few circumstances where Congress has expressly said "thou shalt not" exercise such authority. If we were to allow the NMB to assume the authority it has claimed for itself in this case, we would effectively invite it to assert *any* power over employee relations in the railroad and airline industries without regard to the statutory limitations prescribed by Congress. Such a decision would make no sense, and it surely would not comport with the mandate of *Chevron*. As the Supreme Court itself made clear in *Chevron:* "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9.

STEPHEN F. WILLIAMS, Circuit Judge, dissenting:

Although the substantive issue presented by this case seems relatively unimportant, the court's decision dramatically broadens the scope of judicial review of National Mediation Board decisions. Despite extensive recitation of and homage to precedent establishing a highly deferential standard, Maj. Op. at 136–37, the court in practice uses an approach no more deferential (and perhaps even less so) than ordinary review under *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). I dissent.

Judicial review under § 2 Ninth of the Railway Labor Act, 45 U.S.C. § 152 Ninth, started with a bang—*Switchmen's Union v. National Mediation Board*, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943). Like this case, it involved a question of statutory construction—namely, whether the Act permitted the Board to divide a "craft or class" of employees of a single carrier into smaller units for collective bargaining purposes. Plaintiff union attacked a Board decision that was based solely on the Board's notion that it had no such power, a view without visible support in the statutory language. The Court found the decision absolutely unreviewable, on the principle (as the Court later put it) "that it was for the Board, not the courts, finally to resolve such questions." *Railway Clerks v. Employees Ass'n*, 380 U.S. 650, 659, 85 S.Ct. 1192, 1197, 14 L.Ed.2d 133 (1965).

In *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), the Court somewhat tempered the nonreviewability rule of *Switchmen's*, but not much. At issue was an NLRB order in certification proceedings under § 9 of the NLRA, and the Court appeared to assume that the *Switchmen's* principles applied. *Id.,* 358 U.S. at 187–90, 79 S.Ct. at 183–85. The statute had explicitly barred inclusion of professional employees with nonprofessional ones without the former's consent. The NLRB *conceded* that it had done just that, *id.* at 187, 79 S.Ct. at 183, and the Court found judicial relief available. Evidently not regarding conceded legal error as grounds enough to justify judicial interference, the Court emphasized that the Board order was "contrary to a *specific* prohibition in the Act." *Id.* at 188, 79 S.Ct. at 184 (emphasis added). It stressed how patent a violation the Board had committed, describing the statutory provision at issue as "clear," "mandatory," and "definite". *Id.* at 188, 189, 79 S.Ct. at 184.

In applying the *Switchmen's/Leedom* mandate, this court has stated that the level of judicial review permitted by the decisions is "one of the narrowest known to the law." *International Ass'n of Machinists v. TWA*, 839 F.2d 809, 811 (D.C.Cir. 1988). Specifically, a reviewing court may only take a "peek at the merits" and may interfere only if the peek reveals an error "as obvious on the face of the papers as the violation of specific statutory language". *International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Brotherhood of Ry., Airline & S.S. Clerks*, 402 F.2d 196, 205 (D.C.Cir. 1968).

Taking the prescribed peek, one finds no such blazing error. The Board's *Merger Procedures* provide that railroad carriers that have "merged" (as defined in the Board's regulations) "may invoke the Board's services for a determination of the post-merger status of any NMB certifications on the applicable properties." See *NMB Merger Procedures*, 17 N.M.B. 44, 54 (1989). The *Procedures* also allow the Board to act on its own initiative. See *id.* at 50–51. Investigation and certification—sorting out which union represents which employees—are indisputably what the Board is supposed to do. "[S]o long as the Board is acting with the purpose of 'find[ing] the fact' as to who is the employees' representative, the courts are deprived of jurisdiction to review Board decisions." *America West Airlines v. NMB*, 969 F.2d 777, 781 (9th Cir.1992). The Board here does not propose to go off settling union/carrier disputes or engage in any other activity plainly outside of the Board's mission.

Appellants' only claim is that the Board may not pursue its investigation and certification mandate at a carrier's instigation or on its own hook. But the statute says nothing to bar its doing so in either circumstance. The pertinent provision, § 2 Ninth, reads:

> If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this Chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier.

45 U.S.C. § 152 Ninth.

The language *requires* the Board to engage in investigation and certification at the behest of a "party" to the dispute. The Board does not argue that carriers are parties entitled to "request" such investigation or certification; the Supreme Court rejected a carrier claim to a similar entitlement—participation—in *Railway Clerks*, 380 U.S. at 666–68, 85 S.Ct. at 1200–02. The Board's idea is simply that, as the statute does not preclude investigation and certification activities under other circumstances, it leaves the Board free to act in the circumstances that it has identified in the *Merger Procedures*. No statutory words suggest the contrary.

One might claim a conflict with the statutory language on the theory that if neither a union nor an employee brings the representation issue to the Board, there is no "dispute" to be resolved, so that the statutory predicate—a dispute—is absent. The theory is valid only in the most pedantic and meaningless sense. If investigation procedures are initiated at the behest of a carrier and it proves that the pertinent unions and employees are in harmony as to who represents whom, clearly the proceeding must come to a prompt ending; the Board is not to go out into the world fomenting trouble. But plaintiffs here offer no suggestion that the Board has so acted, or even that the *Merger Procedures* would authorize such conduct.

Of course the Board could fall into "gross" or "clear" error even without the sort of direct flouting of the statute that was conceded in *Leedom*. Judge Leventhal's phrase in *International Bhd.*—an "error ... as obvious as the violation of

specific statutory language"—was well chosen. For example, some powerful linguistic norm might come into play, such as the proposition that when a legislature uses a string of words whose meanings all bear a strong family resemblance, plus a more general word with some meanings that stretch much farther, one reads the general word only in the limited sense common to the others. In Latin, *noscitur a sociis*. Plaintiffs here identify no such linguistic norm that the Board's decision might violate, and none comes to mind.

Alternatively, a strong substantive background norm might control. See generally Cass R. Sunstein, *Interpreting Statutes in the Regulatory State*, 103 Harv.L.Rev. 405, 469–508 (1989). The majority implicitly invokes this idea in its citation of *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649, 110 S.Ct. 1384, 1390, 108 L.Ed.2d 585 (1990), for the proposition that a statute need not express the "truism that States may not preempt federal law" to be read as embracing that principle. Maj. Op. at 138. I agree. Again, the difficulty is that no such substantive norm appears pertinent to this problem. At least neither the plaintiffs nor the majority has identified one.

Possibly one might find such a norm in the statute's legislative history. Plaintiffs and the majority have dredged that history and come up with very little. There is evidence of concern that unions should "be free from employer influence and control", Maj. Op. at 140, but it is not clear why Board sorting out of representation disputes on its own initiative or employer impetus will tend to subject the unions to such control. There is similar evidence of legislative insistence on the Board's neutral status as between carriers and unions, see Maj. Op. at 140, but again there is no evident link to our problem; it is unclear why giving unions and employees the sole initiative is necessary to that neutrality or even conducive to it.

Finally, one might find a controlling background norm in prior judicial authority (though it, in turn, would presumably draw on some independent source such as those discussed above). The cases that the majority invokes, Maj. Op. at 141, are plainly inapposite. Court decisions denying any Board *obligation* to investigate absent a request by employees or their representatives simply do not cut one way or the other in the present case. In fact, the only authoritative judicial pronouncement on the subject points to the Board's freedom of maneuver on the subject: in the course of rejecting a carrier's claim that the statute *entitled* it to be a party to § 2 Ninth proceedings, the Court said firmly that the scope of the carrier's role (if any) was up to the Board. *Railway Clerks*, 380 U.S. at 666–68, 85 S.Ct. at 1200–02. "Whether and to what extent carriers will be permitted to present their views on craft or class questions is a matter that the Act leaves solely in the discretion of the Board." *Id.* at 666–67, 85 S.Ct. at 1201.

Because my peek at the merits reveals no obvious error, I would uphold the Board.

\* \* \*

The majority's approach is radically different. At its core the decision rests primarily (though not by name) on the *expressio unius* canon: to express one thing is to exclude or to compel the opposite result for all alternatives not expressly stated. See Maj. Op. at 138–39. The majority reasons that if Congress mandated certification activity "upon request of either party" and did not explicitly grant the Board authority to investigate on its own initiative or carrier request, then it must have forbidden investigation under those circumstances.

The use of this canon is troubling on many counts. First, the canon is implausible as a matter of linguistic practice. A statute's silence on a matter is typically as easily explained by the legislature's failure to address the point as by an inference that it intended a negative. "Come home right after school" is not a directive to dawdle after Little League.

Second, the canon is peculiarly inapposite in the context of judicial review of administrative agencies under *Chevron*. The canon is triggered by legislative silence, precisely the condition that under *Chevron* is understood to create a gap to be filled by

the agency. See 467 U.S. at 843–44, 104 S.Ct. at 2782–83. See also *Cheney R.R. v. ICC*, 902 F.2d 66, 68–69 (D.C.Cir.1990), and cases cited therein.

Where the scope of judicial review is, as here, even more limited, use of *expressio unius* is exceptionally unjustifiable. Not surprisingly, in *Switchmen's/Leedom* review in the past we have rejected such negative inferences. In *Professional Cabin Crew Ass'n v. NMB*, 872 F.2d 456 (D.C.Cir.1989), we considered the Railway Labor Act's definition of "employee"—a "person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work," 45 U.S.C. § 151 Fifth—and refused to infer from its reference to *current* activity any actual requirement of current work; rather we upheld the Board's decision that former strikers not presently working could vote. "[N]either section purports to speak exclusively." *Id.* at 460. We also refused to draw negative implications from the contrast in wording between the RLA and the NLRA. See *id.* at 461. The majority dismisses *PCCA*, apparently on the theory that there the Board could "pin" its interpretation on statutory language. See Maj. Op. at 138 n. 7. But in both this case and *PCCA* there is statutory language that states something affirmative; in *both* the issue is whether that affirmative implies a negative. Structurally, the issues are just the same.

Despite the recital of the many judicial expressions of exceptional deference, the majority's actual practice is no "peek at the merits". Instead, the court explores the "[c]oncerns underlying the [Railway Labor] Act," Maj. Op. at 140 and "proposed statutory language Congress *rejected*," *id.* at 140 (emphasis in original). Thus it moves beyond any patent error and is reduced to the sort of contentions that *Railway Clerks* forbids us to consider—"arguing in terms of policy and broad generalities as to what the Railway Labor Act should provide". 380 U.S. at 671, 85 S.Ct. at 1203.

Indeed, the court's review appears less deferential even than garden-variety *Chev-ron* analysis. This is of course apparent in its strong reliance on *expressio unius*. In addition, while the Court in *Chevron* expressly discounted prior agency positions on the issue, see 467 U.S. at 862, 104 S.Ct. at 2791 (rejecting the proposition that an agency interpretation "is not entitled to deference because it represents a sharp break with prior interpretations"), here the majority treats a Board observation from 1935 as helpful in locking in today's Board. See Maj. Op. at 140.

Although the majority never explicitly repudiates the standards of *Switchmen's* and *Leedom*, it appears to rely on a view that the issue here is "essentially jurisdictional". Maj. Op. at 141. But the level of deference owed an agency's statutory interpretation—and *Switchmen's, Leedom,* and *Railway Clerks* all involved statutory interpretations—does not necessarily shift just because the issue may be characterized as jurisdictional. See *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 844–45, 106 S.Ct. 3245, 3253–54, 92 L.Ed.2d 675 (1986) (addressing scope of the Commission's jurisdiction over counterclaims); *NLRB v. City Disposal Systems, Inc.*, 465 U.S. 822, 830 n. 7, 104 S.Ct. 1505, 1510 n. 7, 79 L.Ed.2d 839 (1984) (assuming jurisdictional character of "concerted activities" provision of § 7 of the NLRA and declining to apply less deferential standard to the NLRB's interpretation). If our nondeference here is to depend on any such characterization, we must both distinguish the Court's refusal to create such an exception in other contexts, and find some definition of "jurisdictional", a notoriously elusive word. See *Mississippi Power v. Miss. ex rel. Moore*, 487 U.S. 354, 381, 108 S.Ct. 2428, 2444, 101 L.Ed.2d 322 (1988) (Scalia, J., concurring) ("[T]here is no discernible line between an agency's exceeding its [jurisdictional] authority and an agency's exceeding authorized application of its authority. To exceed authorized application is to exceed authority."). See also Louis L. Jaffe, *Judicial Control of Administrative Action* 356–57 (1965). The majority, understandably, attempts neither task.

Equally unhelpful is the majority's suggestion that the issue has a "one-time only

character". Maj. Op. at 141. This is so only in the sense that the issue is one of statutory interpretation—and is equally true of *all* statutory interpretations. Restricting courts to "one-time only" issues, in that sense, places off limits only review for factual correctness and for application of law to facts. In the past, the *Switchmen's/Leedom* line of cases has been understood to confine judicial intervention far more strictly.

I would uphold the Board.